462 So.2d 308 (1984)
Gary Dean LAMBERT
v.
STATE of Mississippi.
No. 54579.
Supreme Court of Mississippi.
October 31, 1984.
Rehearing Denied January 16, 1985.
*309 Travis Buckley, Dan C. Taylor, Ellisville, for appellant.
Bill Allain, Atty. Gen. by Anita Mathews Stamps, Sp. Asst. Atty. Gen., Jackson, for appellee.
Before HAWKINS, DAN M. LEE and PRATHER, JJ.
PRATHER, Justice, for the Court:
This is an appeal from a criminal conviction in the Circuit Court of Covington County. Gary Dean Lambert was charged with capital murder, found guilty of murder *310 less than capital and sentenced to life imprisonment in the Mississippi Department of Corrections.
Lambert appeals and assigns the following as error:
(1) Insufficiency of the indictment;
(2) The admission of allegedly irrelevant and insufficiently authenticated evidence.
(3) The granting of an instruction which would have permitted the jury to find the defendant guilty of manslaughter; and
(4) The trial court's failure to direct a verdict of not guilty;
In addition, Lambert, by supplemental brief pro se, argues that (5) he was denied effective assistance of counsel at trial in contravention of the Sixth Amendment of the United States Constitution.

I.
Gary Dean Lambert, a twenty-four year old unemployed oil field and construction worker, drove his wife to work at 3:00 p.m. in Hattiesburg on January 15, 1982. Thereafter Lambert visited friends and ultimately went to Nick's Ice House where he shot pool and drank beer from about 6:30 p.m. until midnight. At that time Lambert left Nick's with Sharon Smith to go to a private party.
At the party Lambert recalled talking to friends, consuming at least ten beers and whiskey, and smoking some marijuana. He left at about 2:30 a.m. to take Sharon Smith home, in a very intoxicated condition. Lambert was unable to drive and pulled into a gas station to call a friend. While there, Lambert recalled a man named Bob McLain whom he had met at the party asking for a ride home. Recognizing his own condition, Lambert agreed to take him home, but told McLain to drive. Lambert recalled nothing after that until the next morning.
On January 16, 1982, about 9:00 a.m. Herschel and Edwin Trigg were informed that something was wrong at their mother's home. Armed with a pistol and hammer, they discovered that Lambert's automobile was parked in the driveway of their mother's home and that the carport door was bashed open.
The badly bruised body of their 86 year old mother, Pearl Lott Trigg, lay in the bedroom of her home in Seminary, Mississippi. Gary Dean Lambert lay sleeping partially undressed next to the deceased body.
A checkbook with Gary Lambert's name and address on it was discovered under the body of Mrs. Trigg but the investigation failed to produce a murder weapon. Lambert could not recall any events after leaving the gas station until awakened by the Trigg brothers.
At some point, Edwin Trigg hit Lambert on the head with the hammer sufficiently hard enough to cause bleeding. The sheriff was called. Lambert was permitted by the Triggs to go to the bathroom, and after entering, he locked himself inside the bathroom until the sheriff's arrival. Neighbors and friends arrived at the home and were in and out of the home and car before the scene was made secure by law enforcement officers.
Two days later, a grand jury returned an indictment charging that Lambert did commit capital murder while engaged in the commission of the crime of burglary of a dwelling house.
At trial the theory of the prosecution was that Gary Dean Lambert killed Mrs. Trigg during the course of committing a sexual battery after breaking and entering.
The theory of the defense was that Lambert, in an advanced state of intoxication, was placed in Mrs. Trigg's bedroom by some unknown person or persons. Lambert's defense was lack of specific intent, accident, and general denial. State investigation failed to produce any other arrests.
At trial the prosecution developed a case based upon scientific testing. Dr. John Smith, the pathologist who performed the autopsy on Mrs. Trigg testified the cause of death to be strangulation because of fracture of the hyoid bone (Adam's apple) and larynx. Dr. Smith stated that there *311 was evidence of trauma in the form of bruises on the face and chest, extensive laceration of base of tongue, fractures of breast bone and ribs. He found a wad of bloody hair on the inside of the victim's larynx. The time of death was not determined.
Jonette Gothard, an expert in field of forensic serology, testified that blood samples from the deceased, on the bed sheets and blood drawn from appellant Lambert all proved to be type "A" human blood. There was no evidence of seminal fluid or sperm in either the victim's mouth or her vagina.
Testifying for the State, Joe Andrews, a hair fiber specialist, stated that the hair removed from the larynx of Mrs. Trigg exhibited the same microscopic characteristics as the known pubic hair sample of Lambert or someone with similar hair characteristics. Hair removed from the hip, the chin and the mouth of the victim also compared favorably with the known pubic hair of the appellant.
Lambert's attorney also presented scientific proof supporting his defense. Sharon Jones, a blood alcohol specialist at the Mississippi Crime Lab, testified that blood taken from Gary Lambert at noon on January 16, 1982 tested an alcohol level in the blood of .08 percent.
A drug screen analysis on a urine sample obtained from the appellant on January 16, 1982, was performed by J.C. Smiley of the Mississippi State Crime Lab. According to the test, no drugs, chemicals or poison were present in the sample.

II.
Before the trial and throughout the proceeding, defense counsel challenged the sufficiency of the indictment, which charged that Lambert did:
Wilfully, unlawfully, feloniously and of his malice aforethought without the authority of law kill and murder Pearl Lott Triggs, a human being, while he, the aforesaid Gary Dean Lambert, was then and there engaged in the commission of the crime of burglary of the dwelling house then and there occupied by the aforesaid Pearl Lott Triggs, contrary to and in violation of section 97-3-19(2)(e) of the Miss.Code of 1972, Ann. as amended.
The right of an accused "to be informed of the nature and cause of the accusation," U.S. Const. Amend. VI, is a fundamental right.
The indictment clearly complied with Mississippi Code Annotated section 99-17-20 (1972) which requires that a capital murder indictment must set forth the section and subsection number of the code defining the offense alleged to have been committed. See Bell v. State, 353 So.2d 1141 (Miss. 1978). This Court has pointed out that the purpose of section 99-17-20 is to "inform the defendant specifically of the charge against him." Rhymes v. State, 356 So.2d 1165 (Miss. 1978).
Capital murder requires a charge of an underlying felony. Mississippi Code Annotated section 97-3-19(1)(c) (Supp. 1983). In this case the underlying felony was burglary, which is the breaking and entering of a dwelling house with the intent to commit some crime. Mississippi Code Annotated section 97-17-19 (1972). Because the offense of burglary itself requires an underlying crime, an indictment for burglary that does not specify what crime the accused intended to commit is fatally defective. Newburn v. State, 205 So.2d 260 (Miss. 1967). State v. Buchanan, 75 Miss. 349, 22 So. 875 (1898). The question thus raised is whether, in an indictment for capital murder, it is sufficient to allege burglary as the constituent offense without further specifying the crime committed or intended to be committed during the breaking and entering. The decision rests on the basis that capital murder is the charge, not burglary. The elements of capital murder are necessary, and the naming of the underlying felony is sufficient without its elements.
In this case defendant was not found guilty of capital murder, but murder *312 less than capital. Therefore, the constituent offense allegation becomes immaterial.
In an analogous situation we have held many times that "One convicted of manslaughter may not on appeal complain of an instruction dealing with murder, even if erroneous." Carter v. State, 402 So.2d 817, 819 (Miss. 1981); Moss v. State, 386 So.2d 1129 (Miss. 1980); Hull v. State, 350 So.2d 60 (1977). The same reasoning applies here. This Court holds, therefore, that, where the defendant has been convicted of the lesser included offense of murder, we will not reverse because defendant was charged in an indictment for capital murder which failed to state the elements of the underlying constituent offense, in this instance burglary. We express no opinion here whether the indictment would be adequate had the defendant been convicted of capital murder.
We conclude that under these facts no reversible error is present in the indictment.

III.

EVIDENCE
Challenge was made of the introduction of allegedly irrelevant and insufficiently authenticated evidence.

A. CHAIN OF CUSTODY
Appellant assigns as error the trial court's admission into evidence, over defense objection, of several items of physical evidence; the appellant contends that the State failed to prove continuous chain of custody of the evidence. The challenged items are S-18, a vial of bloody hair removed from the larynx of the decedent; S-22, hair samples removed from the hip area of the decedent; and S-23, hair samples removed from the chin and mouth area of the decedent.
From testimony in the record, it is apparent that there is no basis for challenging the authentication of Exhibit S-23. Continuous possession was established by the testimony at the trial of all parties who handled the evidence.
As to Exhibit S-18, Dr. Smith could not, however, recall the name of the crime lab personnel who actually received the evidence.
Exhibit S-22 was initially identified by Harold Marks, Criminal Investigator for the Mississippi Highway Patrol, but Marks could not recall the technician's name that initially received it from him.
The question, as to exhibits S-18 and S-22, is whether the failure of the State to produce as witnesses all of the parties who handled the evidence renders the evidence inadmissible.
This issue has been addressed repeatedly by this Court, and the law is settled. Introduction of demonstrative evidence without preliminary proof of its condition from the time of seizure until the time of examination by an expert witness is a matter for determination within the sound discretion of the trial court. Wright v. State, 236 So.2d 408, 409 (Miss. 1970). This Court will not reverse the trial court's ruling except where this discretion has been "so abused as to be prejudicial to the defendant." Id.
In Grady v. State, 274 So.2d 141 (Miss. 1973), this Court stated that the test is "whether or not there is any indication or reasonable inference of probable tampering with the evidence or substitution of the evidence." 274 So.2d at 143.
Notwithstanding a "break" in the chain of custody, in Nix v. State, 276 So.2d 652 (Miss. 1973), this Court held that the admissibility of evidence was:
(W)ithin the sound discretion of the trial judge, and unless this judicial discretion has been so abused as to be prejudicial to the defendant, this Court will not reverse the rulings of the trial court. Wright v. State, 236 So.2d 408 (Miss. 1970). See also Gallego v. United States, 276 F.2d 914 (C.C.A. 9th, 1960). The test is whether or not there is an indication of probable tampering with the evidence. Stunson v. Florida, 228 So.2d 294 (Fla. App. 1969). In such matters the presumption *313 of regularity supports the official acts of public officers. Gallego v. United States, supra.
276 So.2d at 653. See also Morris v. State, 436 So.2d 1381, 1382 (Miss. 1983). Based on the above authorities, the failure of the State in the case at bar to produce the actual crime lab employees who received exhibits S-18 and S-22 does not render the evidence inadmissible.

B. RELEVANCY
The appellant further argues that the prejudicial value of the challenged previously scientific evidence outweighs any probative value the evidence might have. The argument here is simply that the existence of pubic hair in and around the body of the victim does no more than establish a fact not in dispute, that is that the defendant was next to the body of the deceased for some period of time. Moreover, appellant urges that due to its inflammatory nature this evidence is highly likely to arouse the prejudice of the jury.
The determination of relevancy is left to the sound discretion of the trial judge whose determination will not be reversed in the absence of clear abuse. McNeil v. State, 308 So.2d 236, 241-242 (Miss. 1975). Given the theory of sexual battery upon which the State relied, this Court cannot conclude that such evidence had no probative value or that admission of the hairs found on and around the victim constituted a clear abuse of discretion.

C. SUFFICIENCY
In addition to moving for a directed verdict at the conclusion of the State's case, the sufficiency of the evidence presented by the State was attacked at the conclusion of all proof by motion for a new trial, thereby preserving the alleged error of the trial court. Rainer v. State, 438 So.2d 290 (Miss. 1983).
On appeal, this Court when reviewing the sufficiency of evidence to support a verdict, must consider the evidence in the light most favorable to the State. Brady v. State, 425 So.2d 1347 (Miss. 1983). All evidence supporting or tending to support the verdict, as well as all reasonable inferences that may be drawn from the evidence, must be accepted as true. Id.
In the State's favor, the defendant's body was found beside the deceased. Additionally, the analysis of pubic hair removed from the body of the decedent is affirmative. The testimony of fiber identification specialist Joe Andrews lends support to the State's theory of sexual battery. Andrews' testimony did not entirely exclude a hypothesis of innocence; however, in that some of the hairs could not be matched with either the known samples of the decedent or those of the appellant. Moreover, the defense offered a plausible explanation for the presence of appellant's hair in the vicinity of the decedent since testimony established that the body had been moved several times for the purpose of taking photographs and the victim's mouth was open.
In the defense's favor, there was expert testimony that none of the fluids ordinarily associated with sexual contact were found in the victim.
No murder weapon was found and the absence of bruises on the appellant's hands while not conclusive, is at least consistent with the defense's hypothesis of innocence.
In the case at bar, the State concedes that the case against the appellant rests upon circumstantial evidence. This Court has stated that circumstantial evidence:
Is always insufficient where, assuming all to be proved which the evidence tends to prove, some other hypothesis may still be true, for it is the actual exclusion of every other hypothesis which invests mere circumstances with the force of truth. Whenever, therefore, the evidence leaves it indifferent, which of several hypotheses is true, or merely establishes some finite probability in favor of one hypothesis rather than another, such evidence cannot amount to proof, however great the probability may be.
Sorrells v. State, 130 Miss. 300, 94 So. 209 (1922).
*314 The question then is whether the State's circumstantial case was such as to exclude the defense's hypothesis of innocence. The defense relies upon Weathersby v. State, 165 Miss. 207, 147 So. 481 (1933), which held that:
... (W)here the defendant or the defendant's witnesses are the only eyewitnesses to the homicide, their version, if reasonable, must be accepted as true, unless substantially contradicted in material particulars by a credible witness or witnesses for the state, or by the physical facts or by the facts of common knowledge.
165 Miss. at 209, 147 So. at 482.
Lambert's explanation of his whereabouts on the preceding night in question was largely corroborated up until 3:00 a.m. on the morning of the murder. The testimony regarding the alcohol content in Lambert's blood at around noon the following morning is consistent with the defense's theory that Lambert was in an advanced state of intoxication and, in all likelihood, was unconscious. The defendant had no version due to his intoxication. The only other defense proof offered to the jury supporting Lambert's theory that he was placed in Mrs. Trigg's bedroom by some unknown person or persons was Ricky Cook, a friend of Lambert. He testified to such a version in general terms. But the defense objected to the introduction of his written statement to the jury because of its bizarre content. In fact the defense even challenged the credibility of Cook's testimony by their delving into his being "possessed" through hypnosis to make the written statement. Therefore, the record is absent of any credible eyewitness evidence to the homicide that give a basis for reliance on the Weathersby rule. Additionally, the scientific evidence supported the State's theory.
This Court concludes that this evidence presented is legally sufficient to support the jury's verdict. No error is noted in this assignment.
Likewise, this same reasoning would apply to the assignment of error relating to the court's refusal to direct a verdict of not guilty.

IV.

THE MANSLAUGHTER INSTRUCTION
Appellant assigns as error the granting of a manslaughter instruction on the ground that it invited the jury to find the appellant guilty of a lesser included offense in the event that they could not otherwise agree upon a verdict. Relying primarily on Roberts v. Louisiana, 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976), the appellant contends that the granting of the lesser included offense instruction denied him due process of law.
The responsive verdict procedure condemned in Roberts v. Louisiana, differed decidedly from the case here. The legislative scheme in Roberts provided for four mandatory responsive verdicts and required that the jury be instructed on all of the verdicts whether or not raised by the evidence. 428 U.S. 330, 96 S.Ct. 3004. Moreover, the statute made the death penalty mandatory whenever the jury found a defendant guilty of first degree murder.
The procedure employed in the case at bar is clearly distinguishable. Mississippi statutory scheme does not require the death penalty upon conviction of capital murder. Miss. Code Ann. § 99-19-101 (Supp. 1983). Furthermore, unlike the Louisiana statute, the instruction as to a lesser included offense is not mandatory and such an instruction may be given only when justified by the evidence. Presley v. State, 321 So.2d 309, 310-311 (Miss. 1975). Finally, in the case at bar the trial court expressly admonished the jury not to compromise their verdict in its instruction as to the requirements for a finding of guilty of manslaughter, as follows:
If warranted by the evidence you may find the defendant, Gary Dean Lambert, guilty of a crime lesser than capital murder. However, notwithstanding this right, it is your duty to accept the law as given you by the Court, and if the facts and the law warrant a conviction of the crime of capital murder, then it is your *315 duty to make such a finding uninfluenced by your power to fix a lesser offense. This provision is not designed to relieve you from the performance of an unpleasant duty. It is included to prevent a failure of justice if the evidence fails to prove the original charge but does justify a verdict for the lesser crime.
Also, the inclusion of these instructions on the issues of non-capital murder and manslaughter is not made for the purpose of suggesting that you should compromise your position and vote guilty as to a lesser offense merely to reach a unanimous verdict.
This Court reviewed the practice of instructing the jury with reference to lesser included offenses in light of the Supreme Court decision in Roberts. This Court concluded:
We therefore hold that, when warranted by the evidence, the trial court may instruct the jury with reference to lesser included offenses. However, such an instruction should not be indiscriminately or automatically given, as was condemned in Roberts, supra, 428 U.S. at 335, 96 S.Ct. at 3007, 49 L.Ed.2d at 982, but should only be given after the trial court has carefully considered the evidence and is of the opinion that such an instruction is justified by the evidence.
Jackson v. State, 337 So.2d 1242, 1255 (Miss. 1976). The question then in the case at bar is whether the manslaughter instruction was warranted by the evidence. Mississippi Code Annotated section 97-3-35 (1972) defines manslaughter as "the killing of a human being without malice in the heat of passion but in a cruel or unusual manner or by the use of a dangerous weapon without authority of law and not in necessary self-defense." From a totality of all the proof, we conclude the manslaughter instruction was justified. We find no error in this assignment.

V.

INEFFECTIVE ASSISTANCE OF COUNSEL
Lambert argues in his supplemental brief pro se that he was denied the effective assistance of counsel guaranteed by the Sixth Amendment of the United States Constitution. Lambert directs this Court's attention to the failure of his attorney at trial to object to testimony involving the defendant's prior involvement with narcotics, as reflected in the following excerpts from the record.
I. CROSS EXAMINATION OF STATE WITNESS, HAROLD MARX, AN INVESTIGATOR.
Q. BY MR. BUCKLEY: (Defense Counsel) Do you know a Mr. Charles Neal Hughes?
A. BY MR. MARX: I believe I do... . He lives in close proximity to Mrs. Trigg's home and we've had dealings with him in law enforcement circles before due to his activities... . My intentions in discussing the matter with him was that  I don't want to blacken his name or anything here, but it was alleged that he deals in narcotics at some times and to see if perhaps he were (sic) familiar with Mr. Lambert and maybe that was why Mr. Lambert was in the area.
LATER ON:
A. BY MR. MARX: On one in the  that I had interviewed had mentioned Mr. Charles Hughes. The only reason I was looking for him at all was searching for an explanation of why Mr. Lambert could have been in the area. Mr. Lambert, by his own admission, participated in some drug activity. Mr. Hughes participates in drug activity. I was trying to find out if maybe Mr. Lambert was looking for Mr. Hughes' house was why he would have been in that area.
II. CROSS EXAMINATION OF DEFENSE WITNESS, CARL WAYNE LAMBERT, GARY"S BROTHER.
Q. BY MR. EVANS: (District Attorney) Did he (the defendant) tell you about what he had told investigator Marx?
A. I'm unaware of what he told her, sir.

*316 Q. Did your brother tell you that he told Mr. Marx that some years ago he was running dope for some people and they might have framed him?
A. No, sir.
III. CROSS EXAMINATION OF DEFENDANT, GARY DEAN LAMBERT.
Q. BY MR. EVANS: (District Attorney) And at that point you told him about this business about you having been a drug runner for these people, is that correct?
A. No  I made a remark to Mr. Marx that back when I was in my teens a gentleman asked me to give a  bring a package to a certain place and I  apparently I  I  I didn't know what it was. I assumed what it was, but I did not look and see what it was, and then when I did I started bringing the package to this gentleman and when I did I didn't come to a complete stop at a stop sign and an officer flipped his lights on later on as I went down the road and I threw the packages out, assuming that it was some drugs.
Q. What else did you tell Mr. Marx about that?
A. That was all.
It is well established that the Sixth Amendment right to counsel includes "the right to the effective assistance of counsel." McMann v. Richardson, 397 U.S. 759, 771, n. 14, 90 S.Ct. 1441, 1449, n. 14, 25 L.Ed.2d 763 (1970); Stewart v. State, 229 So.2d 53, 56 (Miss. 1969), quoting Makenna v. Ellis, 280 F.2d 592, 599 (5th Cir.1960).
The issue of ineffective assistance of counsel may be raised by a convicted defendant on direct appeal. Read v. State, 430 So.2d 832, 841 (Miss. 1983).
In the absence of any standard of review from the United States Supreme Court on the question of counsel ineffectiveness, this Court adopted a test to be applied. Callahan v. State, 426 So.2d 801 (Miss. 1983). However, the United States Supreme Court has now addressed this issue in Strickland v. Washington, ___ U.S. ___, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Our decisions since that date have followed the federal standard in application of the Sixth Amendment right. Stringer v. State, 454 So.2d 468 (1984), Thames v. State, 454 So.2d 486 (1984).
In Strickland v. Washington, ___ U.S. ___, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the United States Supreme Court set forth the test by which a claim of ineffective assistance of counsel should be measured. The Court held that, in order to justify a finding of ineffective assistance of counsel, the defendant must prove: (1) that counsel's performance was deficient; and (2) that the deficient performance prejudiced the defense. ___ U.S. at ___, 104 S.Ct. at 2063.
The Court set forth a number of guidelines for evaluating counsel performance. The standard employed is that of reasonably effective assistance. Id. at ___, 104 S.Ct. at 2063. Counsel's performance is to be judged in light of "prevailing professional norm," taking into account "all the circumstances." Id. at ___, 104 S.Ct. at 2065. Moreover, the alleged deficiencies must be judged as of the time of counsel's conduct. Id. As the Court noted:
Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to secondguess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. Cf. Engle v. Isaac, 456 U.S. 107, 133-134 (1982). A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.
___ U.S. at ___, 104 S.Ct. at 2065.
In order to meet the second prong of the test  prejudice to the defense  the defendant must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding *317 would have been different." ___ U.S. at ___, 104 S.Ct. at 2068. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." Id.
The Court noted that: "a verdict or conclusion only weakly supported by the record, is more likely to have been affected by errors than one with overwhelming record support." Id.
Applying the Strickland test to the case at bar, this Court must first inquire whether defense counsel's performance was in fact deficient. Lambert relies heavily on this Court's holding in Brooks v. State, 209 Miss. 150, 46 So.2d 94 (1950). In Brooks the defendant was charged with assault and battery with the intent to kill. On cross-examination the prosecution asked, "This place of business you run is a bootlegging establishment, isn't it?" Defense counsel failed to object to the question. Reviewing the conviction, this Court noted that not a single objection was made by the attorney during the trial. This Court reversed the conviction on the ground that it had been procured by the introduction of inadmissible evidence which was obtained in violation of the defendant's fundamental rights. Id. 46 So.2d at 96.
The case at bar is distinguishable from Brooks on two grounds. First, unlike Brooks, where the record did not reflect a single objection by the defense attorney, in the case at bar the record is replete with defense objections. Secondly, the line of questioning in the case at bar arose out of statements made by the defendant himself to the authorities following his arrest. Lambert candidly acknowledges in his brief that "there was nothing (the attorney) could do about the fact that Gary made various statements to the authorities after his arrest that adversely reflected upon his character and portrayed him as having personal habits which are not readily acceptable to the mainstream of our society."
Examining the one example of alleged counsel deficiency in light of the entire record and bearing in mind the deferential Strickland guidelines, this court concludes that the appellant has failed to meet the first prong of the Strickland test.
We find no reversible error in this record.
Noting that there is an equal division of the court in the vote on this appeal with four judges voting to affirm, four judges voting to reverse, and one judge not participating, the judgment of the trial court is affirmed.
AFFIRMED.
WALKER and ROY NOBLE LEE, P.JJ., and BOWLING, J., concur.
DAN M. LEE, HAWKINS and SULLIVAN, JJ., dissent.
ROBERTSON, J., concurs in part and dissents in part (SULLIVAN, J., joins in dissenting portion).
PATTERSON, C.J., not participating.
DAN M. LEE, Justice, dissenting:
This appeal presents us with one of the most bizarre factual scenarios to ever confront this Court. It combines the disgustingly brutal murder of an 86-year old woman with elements of rape, adultery, a mentally unstable witness who has given both implicating and exonerating statements, alcohol, drugs and tactics by the defense counsel which completely discredit the defendant's version of the events. When all of these elements are considered together outside the excitement and drama of the trial courtroom, I submit that there is a very strong possibility that the jury may have convicted an innocent man. Therefore, for the reasons discussed below I would reverse Lambert's conviction and remand this cause to allow another jury to pass on the question.
Undeniably Gary Dean Lambert was found asleep in bed next to Mrs. Trigg's lifeless body. Also, he was at a loss to explain how this circumstance came about except to say that someone must have put him there. Regardless of however lame that explanation may have initially sounded, an examination of the record reveals *318 that the jury's determination of guilt is tenuous at best.
Lambert testified that the day before he awakened in bed with Mrs. Trigg's body he spent the largest part of the afternoon drinking. He stayed in Nick's Ice House until closing time at midnight when he, Sharon Smith and someone known only as "Charlie" left to go to a party. Lambert testified that he continued drinking at the party and had at least ten more beers, some whiskey and marijuana. At about 2:30 a.m. Sharon Smith asked Lambert to take her home. He testified that he was very drunk by then but that he believed he could drive. After leaving Ms. Smith at her home, Lambert testified the next thing he remembered was seeing the Fast Lane Gas Station on Highway 98. He knew he couldn't drive any further because of his intoxication so he intended to stop there and call a friend to come and get him. While at the Fast Lane Gas Station he saw Bob McLain whom he recognized from the party he had left shortly before. McLain asked Lambert for a ride home and Lambert agreed on the condition that McLain drive. Lambert testified that the next thing he remembered was being awakened by Mrs. Trigg's sons.
The record contains a great deal of support for Lambert's version of the events. Sharon Smith testified and fully corroborated the fact that he took her from Nick's Ice House to the party. She also testified that when he gave her a ride home from the party Lambert was "very drunk." During the ride Lambert ran into a ditch, across someone's yard and nearly sideswiped a bridge. She also added that in the four years she had known Lambert he had never made any sexual advances toward her and he did not do so that night.
Other evidence supporting Lambert's version of the events or at least diluting the state's case is the fact that after his arrest, Lambert was given a blood alcohol content test at noon. That test revealed that he had a .08 blood alcohol content, thereby suggesting a massive ingestion of alcohol hours earlier. There was no evidence of seminal juices either in Mrs. Trigg's throat or vaginal area. There were hairs located on Mrs. Trigg's body and in her bed that could not be traced to her or Gary Dean Lambert. Even the state investigator admitted that the pubic hair found in Mrs. Trigg's throat could have been the result of her mouth being open as police investigators rolled her body around on the bed to take photographs.
Furthermore, the police work done in the investigation of this homicide was almost unbelievably slipshod. Investigators failed to take scrapings from under Mrs. Trigg's fingernails. They failed to make casts of tire tracks around Mrs. Trigg's home. There was an inexcusable lack of security around the crime scene and officers admitted that spectators and others driven by curiosity roamed freely through the house before it was ever sealed to the public. Indeed, the chief investigator, Harold Marx, testified that he had even accidentally sent a pair of his own pants to the state crime lab for analysis!
Perhaps the strongest indication of the weakness of the state's case is in the majority opinion's modest effort to support it. The only factors which the majority is able to point to as supporting the jury's verdict are the facts that Lambert was found in bed with the deceased; an analysis of the pubic hair found on the body of Mrs. Trigg is not inconsistent with Lambert's hair; and Lambert's inability to account for his presence in the deceased's bed. This minutia of evidence does not support a murder conviction. Indeed, even the majority opinion acknowledges that the defense offered a plausable explanation for the presence of Lambert's hair on the body of Mrs. Trigg. Therefore, the state's whole case comes down to Lambert being found asleep in bed with the body of Mrs. Trigg and his inability to explain that, other than to offer proof that he was overwhelmingly intoxicated the evening before.
Now, having shown the state's attempt to prove Lambert guilty of murder was feeble at best, a wild card is thrown into the deck. The wild card in this case is *319 Ricky Cook, a witness called by the defense and whose relationship to the murder of Mrs. Trigg is suspicious at least. On May 10, 1982 Cook gave a statement to Mason Sistrunk, an investigator for the District Attorney's office. In that statement Cook admits involvement in the murder of Mrs. Trigg. He states that he and another person (possibly a step-nephew of Mrs. Trigg's) were in Lambert's car and Lambert was passed out drunk in the backseat. They went to Mrs. Trigg's house and the step-nephew pulled a gun and told Cook "to go in the room and make love to the old lady." Cook's statement said that the step-nephew told him he would shoot him if he tried to leave. According to Cook's statement, the step-nephew held a gun on him while he had sex with Mrs. Trigg. Afterwards the step-nephew told Cook to kill her. When he refused the step-nephew "starting hitting her and choking her." Thereafter, Cook and the step-nephew "got Gary out of the backseat of his car and we had to carry him. We put him in the bed with the old lady. We pulled Gary's shirt off and shoes." The step-nephew then took Mrs. Trigg's hands and scratched Lambert's face with her fingernails. When Cook and the step-nephew left, Lambert was asleep in bed with Mrs. Trigg's body.
Amazingly, defense counsel objected to the introduction of this statement on the grounds that it was false and unreliable. More will be said about that later; however, for present purposes it is important to note that Cook testified that although at the time he gave the statement he believed it to be true, he later became aware that it was the product of hypnotism. Cook testified that he had been hypnotized by a tall dark stranger and that as a result of being under the influence of that hypnosis he went to the district attorney's office and gave the aforementioned statement. He stated that after recanting this statement, he felt greatly relieved but he was not certain whether he was still under the influence of hypnosis. The hypnosis aside, Cook does admit that he recanted the statement after his mother and aunt advised him that they thought it would get him into trouble. It is also significant to note that Cook's recantation of the exonerating statement came at a time when he was having an affair with Lambert's wife.
The application of legal doctrine to this bizarre set of facts leads one further towards the belief that justice will best be served by allowing another jury to pass on the state's evidence. Let us begin by examining the indictment and the majority's handling of that issue. The indictment charged Lambert with capital murder. The factor raising the crime from simple murder to capital murder was that it was committed in the course of an attempted burglary. Clearly, the majority recognizes that our modern definition of burglary also requires an underlying crime. Miss. Code Ann. § 97-17-19 (1972). The majority also recognizes that this Court has held that an indictment which fails to specify the underlying crime is fatally defective. Newburn v. State, 205 So.2d 260 (Miss. 1967); State v. Buchanan, 75 Miss. 349, 22 So. 875 (1897). The majority then goes on to decide that because the jury found Lambert guilty of murder less than capital the fact that the indictment failed to allege the crime underlying the alleged burglary was immaterial. Importantly, the majority was unwilling to say that the failure to allege a crime underlying the burglary would have been immaterial had there been a conviction of capital murder.
The majority's analogy to the rule that "one convicted of manslaughter may not on appeal complain of an instruction dealing with murder, even if erroneous" is not sound. This is so because of the difference in the nature and purpose of an indictment and an instruction. The indictment provides the basis of the notice to the defendant of the crime for which he will be tried. Our cases have held and, any attorney knows, that the failure to be informed of the nature of the charges is tantamount to the failure to allow the preparation of a defense. See for example Newburn, supra; Buchanan, supra.
It is clear from the record that neither the defense counsel nor the trial judge *320 knew that the state would be relying on sexual battery as the underlying crime for the allegation of burglary. This is evident from a reading of a portion of the record which follows the defense counsel's argument regarding a demurrer to the indictment. There the defense counsel argued that the simple breaking and entering into the house of Mrs. Triggs was not a burglary and that it could not be an underlying felony. At that point the district attorney interjected with the following which makes it clear that neither the defense nor the court knew that the prosecution was going to be relying on sexual battery as an underlying offense:
BY MR. EVANS:
Judge, I know you don't want to hear arguments now, but I want to point out, for the sake of the record, that Mr. Buckley has overlooked the elements of the crime of sexual battery altogether.
BY MR. BUCKLEY:
What is the  I don't understand the 
BY THE COURT:
Well, he's not charged with sexual battery. He's charged with burglary, isn't he?
BY MR. EVANS:
Yes, sir, burglary with the intent to commit sexual battery. Burglary, which is the breaking and entering with the intent to commit any crime.
BY THE COURT:
The motion will be overruled, but let me have that indictment, please. (BRIEF PAUSE) Will you approach the bench?
(Whereupon, an off-the-record discussion was had by Court and Counsel at the bench with the Defendant present.)
While admittedly the jury failed to find Lambert guilty of capital murder, it is difficult to imagine that the surprise to the defense and the prosecution's attempt to prove sexual battery had no impact on the jury's ultimate conclusion.
The unspecified charge of sexual battery leads to another problem. During the course of the trial the state was allowed to introduce evidence of the sexual battery. Because Lambert was not charged with sexual battery, the introduction of that evidence was clearly error. Massey v. State, 393 So.2d 472 (Miss. 1981); Sumrall v. State, 257 So.2d 853 (Miss. 1972).
The majority cannot have it both ways, if the sexual battery was charged it was done in such a manner so as to deprive Lambert of notice; if it was not charged then evidence of it was clearly inadmissible. Either way, the inescapable conclusion is that Lambert's right to a fair trial was prejudiced.
As to the chain of custody of Exhibits S-18 and S-22, the majority holds that the failure to establish the chain of custody was a matter for the sound discretion of the trial court. The majority then relies on the lack of "any indication or reasonable inference of probable tampering with the evidence or substitution of the evidence." I am of the firm belief that the failure to adequately establish the chain of custody of the evidence in this case was error. Where the facts supporting a verdict are as weak as they are in this case, and where the police investigation and handling of the evidence has been so lax that a police investigator actually sent his own pants for laboratory analysis, I would be loathe to affirm the commitment of a defendant to a term of life imprisonment.
Objection was made to the relevancy and prejudicial quality of the hairs found on and around the victim. Here I must also take issue with the majority which has concluded that there was no error involved. In two brief paragraphs the majority has decided that because the state proceeded on a theory of sexual battery the probative value of the pubic hairs found around the body of the victim was greater than the prejudicial effect that evidence would have. Let us consider though what probative value that evidence would really have (ignoring only for purposes of argument the fact that the state did not have a valid sexual battery charge). Testimony by the "expert" on behalf of the state did not establish that those pubic hairs actually belonged *321 to Lambert. They were simply "consistent" with the pubic hair of a white male. Undeniably Lambert had slept in the bed. Also, as previously stated, by the admission of the state investigators there was a clear likelihood that the slight amount of pubic hair found in Mrs. Trigg's throat was located there as a result of the actions of these investigators in rolling her body around the bed to take photographs and then covering it with sheets found on the bed while her mouth was open.
Obviously, the prejudicial effect of this evidence cannot be understated. Any rational person would feel some degree of revulsion and disgust by the thought of an oral rape of an 86-year-old woman. Here again the majority has chosen to apply the rule that this Court will not reverse a determination of relevancy absent a clear abuse of discretion on the part of the trial judge. Not only do I feel that the trial court abused its discretion; but, I am also of the opinion that the introduction of this evidence when coupled with the surprise to the defendant that the state would rely on sexual battery as an underlying charge simply throws more fuel on the fire whose flames burn for the reversal of this cause.
Now, as to whether Lambert received effective assistance of counsel. The United States Supreme Court recently decided the case of Strickland v. Washington, ___ U.S. ___, 104 S.Ct. 2052, 80 L.Ed.2d 674. In Strickland, as the majority notes, the Court held that in order to successfully assert an ineffective assistance of counsel claim the defendant must prove that his counsel's performance was deficient and that that deficient performance prejudiced his defense. Conceding that it is far easier to sit back in cool deliberation of appellate questions than to make the instant decisions of instinct and judgment required by trial counsel, I am nonetheless of the opinion that Gary Dean Lambert did not receive effective assistance of counsel.
First, the failure to object to questions concerning Lambert's prior drug involvement is a serious matter. As surely as we have held countless times, evidence of a separate and distinct crime is inadmissible in the trial of another crime. Hicks v. State, 441 So.2d 1359 (Miss. 1983); Sloane v. State, 437 So.2d 16 (Miss. 1983); Davis v. State, 431 So.2d 468 (Miss. 1983); Mason v. State, 429 So.2d 569 (Miss. 1983); Eubanks v. State, 419 So.2d 1330 (Miss. 1982).
Apparently the majority feels that because Lambert admitted his prior drug involvement to investigating officers that the subject was fair game. Such reasoning reflects a misunderstanding of the principles involved. Under such reasoning every statement given to the authorities would be admissible. A layman defendant cannot be expected to be aware of the rules of evidence and to guard his remarks to the authorities with an eye toward those rules. The failure of the defense counsel to object to this line of questioning in the examination of three separate witnesses was very likely to have prejudiced his client.
There is an even more glaring and confounding problem with the tactics of the defense counsel. After extensively questioning Ricky Cook concerning the statement and having it marked for identification, the defense counsel objected when the district attorney attempted to introduce it into evidence. Although his client's defense was that someone had placed him in the bed with Mrs. Triggs' body the defense counsel argued to the court:
BY MR. BUCKLEY:
If it may please the Court, we object to the statement for this reason. It is patently false. I don't think the State of Mississippi contends it is true. If they represent it's true I think they must be  we're not representing to the Court it's true. We don't believe it is in a factual aspect of it true, and we don't believe the State  in fact it's in direct conflict with all of the State's evidence by way of excluding possibilities. What I'm talking about, they said the  that statement says Mr. Lambert knew where Mrs. Trigg's house was and the State has excluded any such possibility.
What I'm saying is, it is in conflict with all the circumstantial evidence as to *322 knowledge and intent of Gary Lambert. The State doesn't contend it's true and the defendant doesn't contend it's true. I merely introduced this witness for the sole purpose of showing his warped and distorted mind and personality and showing that he may have had the criminal mind to have committed the offense and that he knew enough about it to give a statement that it purported to exonerate him and that's all. I did not go into the details of the statement at all.
Undoubtedly Cook's statement corroborates a great deal of Lambert's version of the events. Also, Cook's explanation that he made the statement under the influence of hypnosis induced by a tall dark stranger is suspect to say the least. Furthermore, under the rule of Chambers v. Mississippi, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973), Cook's statement was clearly admissible. I am at a complete loss to understand how the defense counsel could present his client's version of the events and yet object to the introduction of this statement.
Again, I am mindful of the ease with which an appellate court can second guess trial counsel; however, I am convinced that the objection to this statement constitutes ineffective assistance of counsel under the two prong test of Strickland v. Washington, supra. This is so especially in light of defense counsel's statement in the record that he was aware of the holding of the United States Supreme Court in Chambers v. Mississippi, supra.
This Court has not hesitated to invoke its authority to order a new trial to allow a second jury to pass on the evidence where it considers the first jury's determination of guilt to be based on extremely weak or tenuous evidence even where that evidence is sufficient to withstand a motion for a directed verdict. See Shore v. State, 287 So.2d 766 (Miss. 1974); Feranda v. State, 267 So.2d 305 (Miss. 1972); Barnes v. State, 249 So.2d 383 (Miss. 1971); Cook v. State, 248 So.2d 434 (Miss. 1971); Peterson v. State, 242 So.2d 420 (Miss. 1970); Hux v. State, 234 So.2d 50 (Miss. 1970); Quarles v. State, 199 So.2d 58 (Miss. 1967); Yelverton v. State, 191 So.2d 393 (Miss. 1966); Mister v. State, 190 So.2d 869 (Miss. 1966); Cole v. State, 217 Miss. 779, 65 So.2d 262 (1953); Dickerson v. State, 54 So.2d 925 (Miss. 1951); Jefferson v. State, 52 So.2d 925 (Miss. 1951); Conway v. State, 177 Miss. 461, 171 So. 16 (1936). Furthermore, in cases where there may be no single clearly reversible error but an accumulation of minor errors deprives a defendant of a fair trial this Court will reverse a conviction and order a new trial. See Collins v. State, 408 So.2d 1376 (Miss. 1982); Yelverton v. State, 191 So.2d 393 (Miss. 1966).
When the record of this cause is viewed objectively there should be little doubt that Lambert did not receive a fair trial. The accumulation of errors present in the record and the extremely weak circumstantial evidence on which Lambert was found guilty cause the voice of justice to cry out for a new trial. In Barnes v. State, 249 So.2d 383 (Miss. 1971), Justice Rodgers wrote that "Where the trial record reveals a statement of facts indicating a lack of fair trial, it becomes the duty of this Court to insure such trial by granting a new trial." 249 So.2d at 385.
I would reverse and remand this cause to allow another jury to pass upon the question of Lambert's guilt.
HAWKINS and SULLIVAN, JJ., join in this opinion.
ROBERTSON, Justice, concurring in part, dissenting in part:

I.
The indictment in this case is legally inadequate to charge Gary Dean Lambert with the crime of capital murder. Lambert, however, was convicted of "simple" murder, and because the defective portion of the indictment concerns the underlying felony of burglary (of which Lambert in effect has been acquitted), I would not reverse on this point.
I agree that this case is analogous to the cases cited by Justice Prather speaking for *323 the majority to the effect that one indicted for murder but convicted of manslaughter may not on appeal complain of an instruction dealing with murder even if erroneous. One function of an indictment is to give the defendant notice of the charge he will be called upon to defend. Lambert had more than adequate notice that he was charged with the murder of Pearl Lott Triggs and that is what  and all  he has been convicted of.
The "defect" in the indictment is, however, implicated in the serious evidentiary point which, in my view, does mandate reversal. The State was allowed to offer evidence of the crime of sexual battery, a separate and distinct felony wholly unrelated to anything with which Lambert had been charged in the indictment under which he was being tried. This evidentiary ruling was erroneous as a matter of law, resulted in great and obvious prejudice to the accused, and requires reversal here.

II.
First, because it arises from time to time, the point on which I would not reverse needs discussion.
Capital murder, as defined in Miss. Code Ann. § 97-3-19(2)(e) (Supp. 1983), contemplates the interrelated commission of two separate felonies: murder and at least one of the other felonies enumerated in the statute.
It follows that a valid indictment charging capital murder must charge both the murder and the underlying felony with sufficient specificity to withstand a motion to dismiss had either been charged alone. We have intimated as much in Moore v. State, 344 So.2d 731, 735 (Miss. 1977).
In the case at bar so much of the indictment as charges Lambert with murder is sufficient. That portion of the indictment which charges Lambert with the underlying felony of burglary, on the other hand, is clearly insufficient. The language in the indictment relating to the alleged underlying felony of burglary reads:
... there engaged in the commission of the crime of burglary of the dwelling house then and there occupied by the aforesaid Pearl Lott Triggs.
If Lambert had been charged with burglary only, if this language had been all the indictment contained, and if Lambert had been convicted of burglary, this Court would unhesitatingly reverse.
The crime of burglary of a dwelling has two elements: (1) the burglarious breaking and entering of a dwelling, and (2) the felonious intent to commit some crime therein. Moore v. State, 344 So.2d 731, 735 (Miss. 1977); Thames v. State, 221 Miss. 573, 577, 73 So.2d 134, 136 (1954); Brumfield v. State, 206 Miss. 506, 507, 40 So.2d 268 (1949). The indictment lacks language stating what crime Lambert intended to commit inside Ms. Triggs' dwelling. This Court has repeatedly held fatally defective any burglary indictment which fails to specify the crime the accused intended to commit upon his breaking and entering. Moore v. State, 344 So.2d 731, 735 (Miss. 1977); Brumfield v. State, 206 Miss. 506, 507, 40 So.2d 268 (1949); Irby v. State, 4 So.2d 881 (Miss. 1941); Newburn v. State, 205 So.2d 260, 266 (Miss. 1967); State v. Buchanan, 75 Miss. 349, 350-51, 22 So. 875 (1898).
Today, all questions regarding the sufficiency of an indictment are determined by reference to Rule 2.05, Uniform Criminal Rules of Circuit Court Practice. Thames v. State, 454 So.2d 486, 487 (Miss. 1984). Construing Rule 2.05 in the context of a burglary indictment, we have held that, so long as from a fair reading of the indictment taken as a whole the nature and cause of the charge against the accused are clear, the indictment is legally sufficient. Henderson v. State, 445 So.2d 1364, 1368 (Miss. 1984).
In the present posture of the case, however, Defendant Lambert stands convicted of the crime of murder only. So much of the indictment as charges murder is adequate. Applying Rule 2.05, the nature and cause of the murder charge against Lambert are clear from a fair reading of the indictment taken as a whole. Because the deficiency in the indictment relates to a *324 crime of which Lambert has not been found guilty, I would not reverse on this assignment of error.

III.
Having in mind this deficiency in the indictment, I come to what I regard as the reversible error in this case. Without going into detail (because such as been done by Justice Prather for the majority and by Justice Dan Lee in dissent), the State was allowed over timely and proper defense objections to offer evidence to establish the proposition that Lambert was guilty of sexual battery. Sexual battery is the underlying felony the State now says Lambert broke into, i.e., burglarized, Ms. Triggs' dwelling with intent to commit. My problem and concern are that nothing in the indictment told Lambert that the State planned to offer evidence to show that he was guilty of sexual battery, either the gleam in the eye or the consummated variety.
I agree wholly with my colleague Justice Dan Lee when he writes "It is clear from the record that neither the defense counsel nor the trial judge knew the State would be relying on sexual battery as the underlying crime for the allegation of burglary." The evidence of intent to commit sexual battery was beyond the scope of the charge in the indictment and was inadmissible. This case illustrates the wisdom of our traditional rule discussed in Section II above regarding sufficiency of indictments in burglary cases and makes strong the case for continued enforcement in the Rule 2.05 era.
There is a more fundamental reason why evidence of intent to commit sexual battery was inadmissible. It increased the chances that the jury would convict Lambert for reasons other than the State's proof beyond a reasonable doubt of every element of the crime, i.e., murder, charged in the indictment.
It is hornbook law that the accused should be tried for the offense charged in the indictment and for that offense only. Testimony should not be allowed tending to show that the defendant has committed a crime other than that for which he is on trial. Eubanks v. State, 419 So.2d 1330, 1331 (Miss. 1982); Massey v. State, 393 So.2d 472, 474 (Miss. 1981); Mills v. State, 304 So.2d 651, 653 (Miss. 1974). In Sumrall v. State, 257 So.2d 853 (Miss. 1972), the Court stated:
It is a well settled general rule that the issue on a criminal trial should be single and that the testimony should be confined to that issue and on the trial for one offense the prosecution should not be allowed to aid the proof against the defendant by showing he committed other offenses, even though of a like nature. 257 So.2d at 854.
In Mills, the defendant was charged with the felonious delivery of a certain quantity of marijuana. The State offered testimony that the bureau of Narcotics agent tried on the same occasion to purchase two other "Schedule III drugs." 304 So.2d at 652. This Court reversed, holding that evidence of other related offenses should not have been admitted:
Such testimony had no probative value on the question of the guilt or innocence of the defendant as to the crime charged but only served to prejudice the jury. The introduction of this evidence requires a reversal of the case.
304 So.2d at 653.
An analogous fact situation appears in Dabney v. State, 82 Miss. 252, 33 So. 973 (1903). Defendant was indicted and prosecuted for rape. A key state witness lived in a room adjacent to where the rape occurred. The witness was allowed over objection of the defendant to testify that the adjacent room was burglarized the same night as the rape, that his trunk was broken open and a suit of clothes removed. 82 Miss. at 252, 33 So. at 973. The clothes were later found in the possession of the defendant. This court held that the evidence tended to prove a larceny. 82 Miss. at 255, 33 So. at 974. The defendant had been indicted for rape, not larceny. The two offenses were separate and distinct. Even though the two offenses were committed on the same night, that did not *325 make them a part of a single res gestae. Admission of evidence of larceny in the rape prosecution was reversible error.
Several policy considerations support the rule and its enforcement in this case. A defendant should not be required to answer charges other than those for which he has been indicted. The accused is entitled to reasonable advance notice of the allegations he is faced with  and the opportunity to prepare his defense. There is great potential for mischief when evidence beyond the scope of the indictment is received. More important, the jury is likely to judge the defendant  and convict him  because of other anti-social, criminal behavior, behavior outside the indictment. Regularity in trial proceedings requires that the evidence be limited to the offense charged. Justice under the rule of law requires nothing less.
In no sense does the controverted evidence fall with the res gestae or any other exception to the rule noted above. See Hicks v. State, 441 So.2d 1359, 1360 (Miss. 1983); Johnson v. State, 416 So.2d 383, 386-87 (Miss. 1982). At most the evidence would prove Lambert's presence at the scene, a fact abundantly established otherwise and wholly uncontested.
Furthermore, and alternatively, the probative value (if any) of the evidence in issue is swamped by its potential for unlawful prejudice to the accused. Under the law of evidence, this evidence should not have been admitted. Assuming arguendo that I am incorrect on this point and that the evidence technically was admissible, the trial judge nevertheless abused his discretion in allowing the jury to receive such highly inflammatory and largely irrelevant evidence.
Cases abound which hold that any evidence, though technically admissible, which has the apparent potential of unnecessarily arousing and inflaming the emotions of the jury should be excluded. May v. State, 199 So.2d 635, 640 (Miss. 1967) (photos of victim's body, generally admissible in homicide cases, may be excluded); Coleman v. State, 198 Miss. 519, 522, 23 So.2d 404, 405 (1945) (collateral and inflammatory evidence could be excluded).
I would hold that the Circuit Court committed reversible error when it overruled Lambert's objections and allowed the State to present to the jury evidence related to the crime of sexual battery or Lambert's supposed intent to commit same. On all other assignments of error, I concur with the majority opinion authored by Justice Prather.
SULLIVAN, J., joins in dissenting portion.